UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

KYLE ELLISON,                              )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )        No. 2:15-cv-00385-JMS-MJD
                                           )
UNITED STATES OF AMERICA,                  )
                                           )
                    Defendant.             )

**Entry Granting in Part and Denying in Part Defendant's
Motion for Summary Judgment**

Plaintiff Kyle Ellison is a federal inmate. He filed this civil action against the United States of America under the Federal Tort Claims Act (FTCA). Ellison contends that, during his incarceration at the Federal Correctional Institution in Terre Haute, Indiana (FCI-Terre Haute), he received negligent medical care. The United States argues that it is entitled to judgment as a matter of law because it was not negligent with respect to Ellison's medical care and there is no evidence that any negligence caused him injury. This Court recruited counsel to assist Ellison in responding to the motion for summary judgment.[1] The United States replied and subsequently sought to exclude Ellison's witness's opinions at trial. The United States' motion to exclude the opinions of Dr. Rebecca De La Rosa, dkt [89], is **denied** for the reasons set forth in a separate Entry issued this same day.

For the reasons explained below, the United States' motion for summary judgment, dkt [84], is **granted in part and denied in part**.

---

[1] The court is grateful for the efforts of Dorothy D. McDermott and Zachary A. Ahonen in representing Mr. Ellison.

# I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). **The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor**. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (emphasis added). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

**II. Statement of Material Facts**

Applying the standards set forth above, the following statement of facts give Ellison, as the non-moving party, the benefit of all reasonable inferences.

**A. Lipoma**

While in custody at FCI-Terre Haute in May or June of 2014, Ellison injured his forehead on a metal soap dish in the shower. Believing that the subsequent pain and swelling on his forehead would subside over time, Ellison initially treated his injury without seeking medical assistance by applying ice.

A couple weeks following his injury, Ellison mentioned the lump on his forehead to a BOP doctor treating his diabetes. The doctor advised Ellison to give his lump a few more weeks to heal and then to return if the situation did not improve.

After waiting a few weeks, Ellison put in for sick call since the lump on his forehead had not improved. He saw a registered nurse on August 27, 2014. The registered nurse who saw Ellison on that date recorded that Ellison's pain was a "7" on the Pain Scale and that it was aching. The nurse placed Ellison on call-out to be examined by a physician.

BOP medical providers did not see Ellison again for the lump on his forehead until October 17, 2014. On that day, Ellison was examined by Dr. Joseph Bergeron and Dr. Bailey at Health Services. They estimated his lump to be approximately one inch by one inch in size, and recorded that Ellison's pain was a "1" on a scale from 1 to 10 at that time. Additionally, they recorded that the lump was consistent with his prior contusion and identified it as a "possible consolidated hematoma, seroma, [or] lipoma . . . ." Because the conditions indicated the lump could likely

3

resolve on its own without surgery, Dr. Bergeron recommended a six-month period of observation, after which a surgical consultation could be considered. In the meantime, Dr. Bergeron advised Ellison to present to Health Services if his condition worsened.

Ellison continued to suffer from headaches of varying severity. Ellison believed the lump was causing his headaches and dizziness.

Dr. T. Bailey evaluated Ellison for a Chronic Care encounter on January 8, 2015. There is no indication in the medical record that Ellison complained about any bump or contusion on his forehead at that time.

On March 5, 2015, Ellison sent an electronic message to Health Services, stating that he had been told to follow up in six months, was having headaches and dizziness, and would like a consultation. Ms. Dautherly, a BOP employee, responded to Ellison's message by informing him that he needed to sign up for sick call and that he was scheduled to see Dr. Bailey again in July.

BOP Registered Nurse ("R.N.") Matthew Worthington treated Ellison at sick call on March 9, 2015. R.N. Worthington recorded that Ellison's chief complaint was pain in the front part of his scalp at a pain level of "4" on a scale of 1 to 10. He further recorded that the pain quality was "[a]ching" and that it had lasted for "6-12 [m]onths."

On March 17, 2015, Ellison was evaluated at Health Services by Certified Family Nurse Practitioner ("FNP") Christopher Blila. FNP Blila noted that Ellison reported that he had developed a knot on his forehead that would not go away and "problems with constant headaches in the area of the injury since." FNP Blila noted further that the "3 cm x 3 cm" lump on Ellison's forehead was "most likely" a fatty lipoma. A lipoma is a benign condition of the subcutaneous

tissue.[2] This was the first time since his injury that any BOP medical provider informed Ellison that his knot might be a lipoma. FNP Blila placed a request for Ellison to receive a General Surgery consultation to evaluate the lipoma and the possibility of removal.

Despite Ellison's complaints that the lipoma was causing chronic headaches, dizziness, and was growing, the BOP's Utilization Review Committee ("URC") denied the consultation request made by FNP Blila on March 18, 2015, as merely cosmetic.

When Ellison's symptoms persisted, he returned to sick call on April 6, 2015. Certified Physician Assistant ("PA") Genevieve Daugherty recorded that Ellison's pain on that visit was a "7" on a scale from 1 to 10. PA Daugherty further noted that Ellison reported intermittent pain at the site of his lipoma. Finally, PA Daugherty indicated that Ellison's lipoma had grown from "3 cm x 3 cm" to a size of "4 cm x 3.5 cm" in a matter of only twenty (20) days. PA Daugherty again requested that Ellison receive a General Surgeon consultation to assess his lipoma. The URC approved the second request for Ellison to receive a General Surgeon consultation on April 8, 2015.

On April 10, 2015, Ellison complained to the Assistant Warden that he did not feel like enough was being done to address his condition. The Assistant Warden contacted Christopher McCoy, the Assistant Health Services Administrator ("AHSA"), who met with Ellison on April 13, 2015. During this meeting, Ellison claimed that nothing was being done to address his lipoma.

---

[2] The United States' evidence supports the assertion that while lipomas may increase in size after trauma, lipomas are not widely believed to be caused by trauma. The existence of the lipoma and not its cause is material to this case. In other words, any dispute over what caused Ellison's lipoma has no bearing on whether the BOP negligently treated the lipoma.

Ellison questioned why, after numerous medical assessments over the course of several months, Health Services had not taken an MRI, x-ray, or otherwise run any tests on the lump on his forehead. R.N. McCoy agreed to have another clinician examine Ellison during mainline on April 13, 2015, but Ellison was not able to attend mainline due to missing his "move" while at work.

On May 12, 2015, Ellison had his General Surgery consultation with Dr. Brett Guinn, a contract surgeon not employed by the BOP.[3] Dr. Guinn confirmed that Ellison had a lipoma and recommended surgical removal given Ellison's symptoms relating to the lipoma. The medical records memorialize that Dr. Guinn discussed with Ellison "the risks of poor scarring, poor cosmetic result, [and] nonresolution of his headaches" and that Ellison understood and agreed to proceed. Ellison asserts that contrary to the medical records, these risks were not discussed with him. Ellison agreed to the excision of his lipoma, and Dr. Guinn submitted requests for an offsite general surgery appointment and an onsite general surgery follow-up appointment.

On July 21, 2015, Dr. Guinn removed the lipoma at the Wabash Valley Surgery Center. To close the wound, Dr. Guinn used black, interrupted 3-0 nylon vertical mattress and simple skin sutures near Ellison's hairline.

After the surgery, Ellison was provided with discharge instructions that advised Ellison— among other directions—that the "[s]utures need to be removed in 10 days at Health Services" and that he needed to "[c]hange dressing as needed," "[p]lace Neosporin on wound," and "cover with

---

[3] The United States correctly notes that because Dr. Guinn is an independent contractor and not a BOP employee and that "the United States is not responsible under the Federal Tort Claims Act for the torts committed by its independent contractors." *Wright v. United States*, 404 F.2d 244, 246 (7th Cir. 1968).

gauze daily." In order to assist Ellison with managing pain following the excision of his lipoma, Dr. Guinn prescribed him "5 mg" doses of "acetaminophen- HYDROcodone 325 mg – 10 mg oral tablet" ("Hydrocodone") to take every four (4) hours on an as-needed basis.

Upon his return to FCI-Terre Haute that same day, Ellison was seen at Health Services, voicing "no complaints at this time." R.N. Stephen Mize, purportedly following verbal orders from PA Daugherty, disregarded Dr. Guinn's direction to provide Ellison with Hydrocodone to treat his pain and instead provided him with ibuprofen. R.N. Mize noted that Ellison's sutures were to be removed in ten (10) days. He instructed Ellison to follow-up with Sick call if he had any additional issues in the interim.

Following the surgery, the tissue that was removed was tested, confirming that it was indeed a lipoma and not cancerous.

**B. Removal of Sutures**

On the ninth day following his surgery, Ellison reported to Health Services to determine what time they wanted him to return on July 31, 2015, to have his sutures removed. He spoke with R.N. Worthington, who informed him that he needed to return that same afternoon, July 30, 2015, to have his sutures removed and not on the following day. According to R.N. Worthington, inmates from a different part of the prison would be visiting on July 31, 2015, making it too busy for the health care providers to see Ellison.

Ellison returned as R.N. Worthington had instructed him. When Ellison arrived at Health Services, R.N. Worthington was eating. R.N. Worthington asked Ellison to give him a few minutes, but Licensed Practical Nurse ("LPN") Nicole Clingerman offered to remove the sutures

for R.N. Worthington. Ellison, R.N. Worthington, LPN Clingerman, and Dental Hygienist Kimberly Rhoads joked about R.N. Worthington's hands being too large to remove the sutures from Ellison's forehead.

Rhoads stated that she would remove Ellison's sutures, but Ellison took her statement as a joke. Ellison believed that LPN Clingerman would be the one to remove his sutures, but he started to get apprehensive when it seemed Rhoads was going to proceed. Ellison questioned Rhoads' qualifications to remove his sutures. Rhoads responded by telling Ellison to "stop being scared" and that she takes stitches out of smaller places like mouths. Still believing that LPN Clingerman would be the one to remove his sutures, Ellison continued to joke with Rhoads about her removing his sutures.

Once LPN Clingerman returned with a tray to remove Ellison's sutures, she told Rhoads that Clingerman could handle the removal. But Rhoads insisted that she would remove Ellison's sutures, called two (2) dental assistants into the room with her, and proceeded to remove the sutures. Neither LPN Clingerman nor R.N. Worthington were present in the room when Rhoads removed Ellison's sutures.[4]

---

[4] At this point in the proceedings, Ellison's testimony is accepted as true as the summary judgment standard requires. Rhoads, however, testified that RN Worthington asked her to assist in Ellison's suture removal by holding some of Ellison's hair back so RN Worthington could differentiate the suture material from Ellison's hair. According to Rhoads, she merely held back Ellison's hair while RN Worthington actually removed the sutures. In response, Ellison argues that Rhoades testimony is inconsistent with the fact that his hair had not grown back following the surgery at the time the sutures were removed.

The BOP has not produced any record of Ellison's encounter with Health Services that day or regarding the removal of his sutures. There is no medical record regarding the status of Ellison's wound when the decision to remove his sutures was made.

**C. Treatment after Suture Removal**

Later in the evening on July 30, 2015, the same day Rhoads removed Ellison's sutures, Ellison's wound dehisced (reopened) along his incision. Ellison was playing cards when his head started bleeding at the site where Rhoads had removed his sutures. He went back to Health Services and a medical care provider cleaned Ellison's bleeding wound, covered it with gauze, and instructed Ellison to report to sick call the following morning.

The next day, on July 31, 2015, Ellison reported to Health Services, where he was treated by PA Heather Mata. Ellison was concerned about wound dehiscence—or opening—at the surgical site. PA Mata noted a 1 cm opening, but no drainage or signs of infection. When treating Ellison, PA Mata found that he still had sutures remaining in his wound because not all his sutures had been removed the previous day. Due to the position of the opening and the exposure of the scalp, PA Mata placed a single staple in the middle of the opening to decrease the risk of infection and prescribed a course of antibiotics as an extra precaution. PA Mata further advised Ellison to return to Health Services as soon as possible if any problems arose.

On August 6, 2015, Ellison was examined by PA Daugherty at Health Services. Ellison reported that the incision had bled the previous night. Upon examination, PA Daugherty noted: "Apparently there was partial dehiscence. However, today the surgical incision is clean and together." PA Daugherty further noted the presence of some dried blood, but found no signs of

infection. Ellison was concerned that the lipoma could still be present, but denied any pain. PA Daugherty instructed Ellison to follow- up as needed, keep the area clean and dry, and return if there were any signs of infection.

Three days later, on August 9, 2015, Ellison returned to sick call as his wound had reopened again. Nurse Cindy McGee noted that Ellison's wound was had a "2 cm superficial opening" and a small amount of bloody drainage. She instructed Ellison to return to sick call the following day, which he did. Ellison met with PA Mata on August 10th. At that time, she took a culture to ensure that the wound had not become infected, renewed Ellison's antibiotics, and again instructed him to follow-up with sick call or at the Chronic Care Clinic as needed.

On August 10, 2015, Ellison reported to Health Services, where his wound was rechecked by PA Mata. PA Mata noted that the wound was not healing in a timely manner, had dehisced twice, and was still swollen and draining material. Although Ellison was already on antibiotics, PA Mata ordered a culture of the wound, in case the current antibiotic was not covering the active bacteria. She also prescribed additional antibiotics and instructed Ellison to keep the area covered and clean. The wound culture showed no growth over the course of three days.

On August 25, 2015, Ellison returned to Health Services for follow-up. Although there was still some soft tissue swelling, there were no signs of infection and Ellison again reported no pain. Ellison was instructed to follow up at sick call and Chronic Care Clinic as needed and return to sick call if there was no improvement.

Three days later, on August 28, 2015, Ellison reported to sick call, indicating that his "sugars [were] all over the place." RN Worthington noted that, despite Ellison's current complaints, "he rarely, if ever," came to receive his morning insulin.

On September 9, 2015, Ellison was seen by Dr. T. Bailey for a Chronic Care visit. Dr. Bailey noted that Ellison's diabetes had been improving over the course of the last year, but that progress seemed to have stalled because he was not taking his prescribed insulin. Dr. Bailey strongly encouraged Ellison to receive all his prescribed insulin, follow his diet, and resume an exercise program.

On October 12, 2015, Ellison experienced a shooting pain at the location of his lipoma excision wound. RN Sarah Walters was sent to Ellison's housing unit and observed that he was "standing in day room without any visible difficulty." When examined by R.N. Sarah Walters, Ellison still had minor swelling at the site of his excision. R.N. Walters also recorded that Ellison was complaining of the "onset of sharp, shooting pain from [the] swollen area of [his] scalp to [his] forehead." Further, Ellison's pain level was a "7" out of 10. R.N. Walters noted that Ellison compared the pain to that which he had experienced prior to the lipoma's excision. After completing her examination, RN Walters concluded that Ellison was in "No Apparent Distress." She noted that his speech was "clear and easy," his mentation was "normal," his respirations were "unlabored," and his skin was "warm, dry, and of normal pigmentation." RN Walters advised Ellison to return to his unit, rest, and follow up with sick call in the morning, but that he could contact them sooner if his condition worsened or his symptoms changed.

On October 13, 2015, Ellison had an in-house follow-up appointment with Dr. Guinn. Ellison reported that he had pain at the surgical site, was unhappy with the appearance of the site, that his hair had not grown back around the incision, and that he still had a small lump. On examination, Dr. Guinn noted that the wound was healed and that, although there was some mild swelling, there was no residual lipoma palpable. Dr. Guinn further found that the hair had not grown back in the scar area, but that, otherwise, it was a "grossly normal postoperative exam" and that he had the "normal postoperative scar."

Ellison has continued to experience headaches and pain at the site of his incision. But given the BOP Health Services' lack of success in treating his symptoms, he has given up on seeking assistance. Ellison currently attempts to manage his pain related to headaches and at the site of his lipoma excision through over-the- counter pain relievers. As of October 31, 2016, Ellison had not sought treatment for the lipoma since he saw Dr. Guinn a year before.

###### D.    Kimberly Rhoads

Rhoads has worked as a dental hygienist at FCI-Terre Haute since April 2013. She received an Associate's Degree in Applied Science with a focus in dental hygiene from Lakeland College and became a licensed hygienist in June 2005. Rhoads received training regarding sutures in general at Lakeland College in 2004, during a course entitled, "Expanded Duties." This instruction included placing and removing sutures on fake tissue. After obtaining her license, Rhoads worked in private practice as a dental hygienist for several years before joining the BOP.

At FCI-Terre Haute, Mr. Rhoads has been assigned more responsibilities than she would have in private practice as a dental hygienist. Rhoads' original Dental Hygiene Practice Agreement

includes no mention regarding suture removal or the like. But her amended Practice Agreement, dated after Ellison filed his Complaint, specifically provides that Rhoads may provide "therapeutic and preventive procedures for patients by performing expanded duty functions including reversible restorable procedures, post-op treatment, suture removal, [and] administration [of] anesthetic (if trained)." When questioned about the reason for the changes to her Practice Agreement, Rhoads was uncertain. In addition to her dental hygienist duties, Rhoads is trained as a correctional officer.

At FCI-Terre Haute, Health Services, which encompasses both dental and medical, is located in one wing. The Health Services staff takes a team approach to medicine in which they are expected to provide assistance to one another. Rhoads testified that she has assisted nursing staff at FCI-Terre Haute in removing sutures a handful of times. Rhoads' deposition testimony, however, is unclear. When asked if she had removed any sutures prior to the amendment of her Practice Agreement, Rhoads responded by stating, "I don't recall." When questioned what areas of the body she had removed or helped remove sutures from, she replied, "I don't even remember." When asked how many times she had removed or helped to remove sutures, Rhoads responded again by stating, "I don't know."

On August 31, 2015, approximately one month after his sutures were removed, Rhoads issued Ellison an incident report for insolence toward a staff member, being in an unauthorized area, refusing to obey an order, and interfering with a staff member in performance of their duties. As a result, Ellison was sanctioned with loss of phone privileges for 30 days, which was suspended for 90 days. As of October 31, 2016, this was the only time Ellison had been disciplined while he was incarcerated at FCI-Terre Haute.

### E.    Dr. Rebecca De La Rosa, DDS

Ellison relies on common knowledge and the opinion of Dr. Rebecca De La Rosa, DDS, a licensed dentist who has run her own private practice, Avon Family Dentistry, since 1990. Dr. De La Rosa received her degree in dentistry from Indiana University School of Dentistry in 1990. According to Dr. De La Rosa, the first two years of dental school were at the medical school, taking the same courses as the medical students. After these first two years, the dental students separated from the medical students and received education focused on dentistry.

Additionally, during dental school, Dr. De La Rosa did rotations through hospitals; one time she removed an appendix and another time she placed or removed sutures in the scalp area. She also learned how to place sutures in dental school, practicing on different cloths and receiving lectures before placing and removing sutures on patients, in both intraoral and extraoral areas. Every time she placed and removed sutures she was clinically evaluated. Dr. De La Rosa went through these rotations and received this training approximately 30 years ago.

In trauma cases, Dr. De La Rosa has placed sutures on areas surrounding the mouth, such as the lip and nose.  Dr. De La Rosa testified that, in over 30 years, she has placed sutures on the structures surrounding the mouth "several times."  She could not provide the number of times she had done this, but testified that it was more than 20; she could not recall if it was more than 30. In her practice, she does not place sutures extraorally on a weekly basis; it is possible that she does so on a monthly basis, but she could not provide a further estimate.

Dr. De La Rosa testified that a licensed dental hygienist removing sutures does so outside the permissible scope of his or her license and acts in violation of the Indiana Dental Hygienist

Act. Dr. De La Rosa opined that specific training is necessary to properly remove both intraoral and extraoral sutures. According to Dr. De La Rosa, such training can consist of the training that she had in dental school, in which she was given lectures and clinical demonstration and clinically evaluated on her placement and removal of sutures. Dr. De La Rosa does not know what kind of training Rhoads had regarding the removal of sutures.

Dr. De La Rosa opined that "[d]amage to the healing site could have resulted in opening the wound, making the site vulnerable to infection, scarring and ultimately interfering with healing." When asked to explained her use of "could have," Dr. De La Rosa explained that she had not read anything that said the wound was completely healed before removal, but that she read it opened up again after suture removal, "which lead[ ] [her] to believe perhaps there is a chance that something—good chance that something happened during suture removal." This is purely based on what she read and the fact that, before the suture removal, there was no wound dehiscence, and "it appears it was there afterwards."

At the same time, Dr. De La Rosa acknowledged that there are several other factors that can affect wound dehiscence, including re-traumatization, diabetes, obesity, and uncontrolled hypertension. Dr. De La Rosa agreed that Ellison was a controlled diabetic and that it was possible that his diabetes could have contributed to wound dehiscence. She further testified that, if, when examining a wound to determine if it is the proper time to remove sutures, there is infection, pus, or a gaping hole, then it is premature to remove the sutures.

**F. Dr. Jeffrey A. Kons, M.D.**

On behalf of the United States, Dr. Jeffrey A. Kons, a primary care physician for Indiana University Health Physicians and Assistant Professor of Family Clinical Medicine at the Indiana University School of Medicine, authored an opinion regarding the care that BOP medical staff provided to Ellison pertaining to the lipoma on his forehead.

Dr. Kons opined that there is no medical necessity to remove a subcutaneous lipoma and no medical intervention that prevents a lipoma from increasing in size; the decision for surgery is elective and based on the patient's desire for an improved cosmetic appearance or to avoid the sensation of localized tenderness.

According to Dr. Kons, the typical standard for suture removal for scalp and face lesions is 5 days, which is considered an adequate time to ensure wound closure and minimize the disfiguring scarring caused by the prolonged presence of sutures; "[a] less optimal cosmetic effect is the expected result of keeping sutures in a scalp wound for 10 days." Dr. Kons further concluded that "[t]here is no basis to believe the dehiscence of a surgical wound on the scalp is the result of sutures being removed 9 days after surgery." According to Dr. Kons, there would be no substantial difference between removing Ellison's sutures on day 9 and removing them on day 10.

Generally, some patients are at an elevated risk of having poor wound healing, including cigarette smokers and diabetics. According to Dr. Kons, the inappropriate removal of sutures—the physical act of snipping and pulling sutures out—would not cause reopening of the wound.

According to Dr. Kons, "[m]edical assistants routinely remove sutures in primary care offices. Medical assistants have limited training and function in a manner similar to dental

assistants. If there is uncertainty about a wound, supervising providers provide evaluation and support. A dental assistant can be trained in a similar manner to safely remove sutures under the surveillance of a higher licensed provider such as an RN, NP, PA, or physician."

Dr. Kons further opined that "there is no licensing or training requirement for providers to prove competence at removal of sutures" and no formal or uniform process of suture removal; it can be done by laypeople. Dr. Kons has patients that remove their own sutures all of the time. It would not be a violation of the standard of care in a primary care setting to have a team member in the office remove sutures; anyone that was felt to be adequately comfortable performing that procedure would be allowed to do so. Thus, it would be within the standard of care for a receptionist, who had been trained, to remove sutures.

In Ellison's case, Dr. Kons' opinion is that the person who actually performed the suture removal does not matter; rather, the wound edges had failed to heal, the removal of the sutures needed to happen, and whoever removed the sutures did not affect the fact that the wound had not healed. Ultimately, based on his review of Ellison's medical records and his experience and training as a family physician, Dr. Kons found "no medical basis to support Ellison's claim that length of time between the presence of his symptoms and surgery, the timing of suture removal, or the individual who removed his sutures had any effect in his surgical outcomes. The sutures were not removed prematurely. Ellison suffered a wound dehiscence with scarring, a complication of the procedure that was not a consequence of the care provided by the primary care providers." According to Dr. Kons, the primary care providers complied with the standard of care in evaluating

and referring Ellison, and there is no evidence that the standard of medical care was violated by his primary care providers.

### III. Discussion

Ellison argues that the United States negligently provided him medical services while under their care. In particular, the United States negligently removed Ellison's sutures before they were ready following his surgery; this increased his scarring and caused unnecessary pain and suffering. Additionally, the United States negligently treated Ellison's pain and suffering from the time he initially developed his lipoma to the present.

The United States argues that Ellison alleges that Bureau of Prisons (BOP) medical staff was also negligent for misdiagnosing his lipoma as a calcium buildup and not giving him a CT scan or MRI, necessitating surgery to remove the lipoma. It appears that this claim has been abandoned by Ellison. To the extent this claim is being pursued, the United States is entitled to summary judgment in its favor as to this claim. There is no evidence to support a negligence claim based on this theory. The motion for summary judgment is **granted** as to this particular claim for relief.

#### A. Federal Tort Claims Act

Under the FTCA, whether a claim can be made against the United States depends on whether a private entity under like circumstances would be liable "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Because the actions Ellison complains of occurred in Indiana, Indiana law applies to this case.

The United States argues that to survive summary judgment, Ellison must have evidence to support a medical malpractice claim, the elements of such a claim are: "(1) that the [medical provider] owed a duty to the plaintiff; (2) that the [medical provider] breached that duty; and (3) that the breach proximately caused the plaintiff's injuries." *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016) (*quoting Mayhue v. Sparkman*, 653 N.E.2d 1384, 1386 (Ind. 1995)). To prove causation, a plaintiff must present specific facts that would demonstrate that the defendant's allegedly negligent behavior caused the plaintiff's injuries. *Midwest Commerce Banking Co. v. Livings*, 608 N.E.2d 1010, 1013 (Ind. Ct. App. 1993); *see also Topp v. Leffers*, 838 N.E.2d 1027, 1032 (Ind. Ct. App. 2005) (stating that proving proximate causation requires that the plaintiff show "a reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered").

The application of medical malpractice law seems reasonable, but for the fact that the United States presents an expert opinion to argue that there is no medical necessity to remove a lipoma, prescription pain relievers are not necessary to treat pain associated with a lipoma, there is no licensing or training requirement for providers to prove competence regarding suture removal and wound treatment and that a non-medical provider (i.e., a receptionist) is qualified to remove sutures. If the treatment of Ellison's surgical wound is not a medical issue as the United States' evidence suggests, then the medical malpractice case law is irrelevant. But of course the treatment of a scalp wound following surgery is a medical issue, particularly when the treatment occurs at a health clinic, the wound is not healing and the patient has diabetes.

There is no disagreement that the BOP owed a duty of care to Ellison during his incarceration at FCI-Terre Haute. 18 U.S.C. § 4042(a)(2) ("The Bureau of Prisons . . . shall provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons . . . . convicted of offenses against the United States. . . ."); *see also Gottlieb*, 624 F. Supp. 2d at 1025 ("Indiana law recognizes that a custodian has a legal duty to exercise reasonable care to preserve the life, health and safety of a person in custody.") (internal citations omitted). The next issue is whether BOP employees breached their duty to Ellison.

Ellison asserts that the BOP breached its duty by negligently removing his sutures and negligently managing his pain. The United States argues that the BOP providers did not breach the standard of care in treating Ellison and that even if there was a material fact in dispute on that element, it is still entitled to judgment as a matter of law because Ellison cannot establish causation. For the reasons explained below, the United States is not entitled to summary judgment as to the claim that the BOP negligently removed Ellison's sutures. The United States is entitled to summary judgment as to the claim that the BOP negligently managed Ellison's pain.

### B. Suture Removal

Ellison argues that the United States breached its duty to him by negligently removing his sutures under the doctrine of negligence *per se.*

"In Indiana, a violation of a statute may serve as the basis for negligence *per se*. The unexcused or unjustified violation of a duty proscribed by statute constitutes negligence per se if the statute is intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred as a result of its violation." *Parks*

*v. Danek Med., Inc.*, No. 2:95 CV 206, 1999 WL 1129706, at *11 (N.D. Ind. June 17, 1999). "Under negligence *per se*, the law accepts the legislative judgment that acts in violation of the statute constitute unreasonable conduct. A person whose acts are negligent *per se* can still invoke the excuses available to any negligent actor such as emergency response or lack of capacity." *Cook v. Whitsell-Sherman*, 796 N.E.2d 271, 276 (Ind. 2003) (citing Restatement (Second) of Torts § 288A; *Gore v. People's Sav. Bank*, 235 Conn. 360, 665 A.2d 1341, 1345 n. 10 (1995)). Negligence *per se* does not definitively establish liability for negligence, but it permits a presumption of negligence. *Parks*, 1999 WL 1129706 at 11.

Ellison argues that the United States breached its duty to Ellison when dental hygienist Kimberly Rhoads removed his sutures in violation of the Dental Hygienist Act of Indiana ("IDHA"), Indiana Code § 25-13-1- 1 et seq. The IDHA sets forth the licensing requirements for dental hygienists operating within the State of Indiana. See, e.g., Ind. Code §§ 25-13-1-3, 4, 6-8. It also provides restrictions on the scope of permissible activities in which a dental hygienist can engage under Indiana law. See Ind. Code §§ 25-13-1-10, 10.6, 11.

Noticeably absent from the IDHA is any authority for a dental hygienist acting within the scope of her license to remove sutures, regardless of whether supervised by a dentist or not and regardless of whether the sutures are placed intraorally or extraorally. The Indiana State Board of Dentistry is tasked with enforcing the IDHA, adopting rules necessary to allow its proper enforcement of the IDHA, and also adopting rules for the proper conduct of dental hygienists. Ind. Code § 25-13-1-5. Dr. Rebecca De La Rosa - Ellison's expert - is an Indiana State Board of Dentistry emeritus dentist, previously served a seven (7) year term on the Indiana State Board of

Dentistry, and served as the Indiana State Board of Dentistry's President from 2004-2005. She stated unequivocally that the IDHA "does not allow hygienists to remove sutures with or without direct supervision." Moreover, she stated that with respect to Rhoads' removal of Ellison's sutures, it was her opinion that "the dental hygienist operated outside the scope of practice for a hygienist when removing the facial sutures from Ellison's forehead." Thus, a reasonable trier of fact could conclude that Rhoads violated the IDHA by removing his sutures.

In addition, Ellison falls within the class of persons the IDHA was intended to protect. "This chapter shall be deemed to be enacted in the interests of public health, safety and welfare, and its provisions shall be liberally construed to serve such interests." Ind. Code § 25-13-1-19 (emphasis added). As a result, the IDHA provides that it was enacted in the interest of Ellison's health, safety, and welfare; he is a member of the "public."

Further, the statute is intended to protect against the risk of the type of harm inflicted upon Ellison. The IDHA attempts to delineate the scope of a dental hygienist's activities so as to promote the interests of public health, safety, and welfare. One way the IDHA attempts to mitigate the risk of injury to those receiving treatment by dental hygienists for activities outside their permissible scope is by subjecting dental hygienists failing to comply with the statute or the rules adopted pursuant to it to discipline. Ind. Code § 25-13-1-20.

Ellison has set forth sufficient evidence satisfying all elements of negligence *per se* as to the removal of his sutures, such that he has set forth a breach of the United States' duty to him and summary judgment is inappropriate. The United States' argument that Rhoads was not acting as a dental hygienist when she removed Ellison's sutures is not sufficient to entitle it to judgment as a

matter of law. Nor is the United States' expert's opinion that anyone adequately comfortable performing that procedure should be allowed to do so. This evidence, at most, creates a material fact in dispute to be resolved at a bench trial.

Ellison argues that, even if the doctrine of negligence *per se* does not apply, summary judgment should be denied because he has sufficient evidence that the United States breached its duty under a traditional medical malpractice theory of liability. This Court agrees. Ellison has presented expert testimony supporting his claim that Rhoads' removal of his sutures was below the standard of care. Dr. De La Rosa, as a dentist, is qualified to provide an expert opinion on suture removal generally. Based on her credentials as a licensed dentist with nearly thirty (30) years of experience - including extensive experience performing oral surgery and placing and removing sutures - Dr. De La Rosa's testimony on the considerations prior to suture removal are reliable.

Ellison has also presented sufficient evidence to survive summary judgment on the issue of caution. This evidence includes a lay person's common knowledge, Dr. De La Rosa's opinions, and Ellison's testimony. At this point in the proceeding, a summary of the evidence considered in the light most favorable to Ellison as the nonmoving party, is that his sutures were removed a day earlier than directed by the surgeon. The sutures were removed by a dental hygienist while those present were joking around. The wound had not healed at the time of the suture removal, perhaps because of Ellison's diabetes. Not all of the sutures were taken out. No record of this medical encounter was recorded. Within a few hours, the wound reopened while Ellison was playing cards. At that time another medical care provider cleaned Ellison's bleeding

wound, covered it with gauze, and instructed Ellison to report to sick call the following morning.

The next day, on July 31, 2015, Ellison reported to Health Services, where his wound was treated by PA Heather Mata. When treating Ellison, PA Mata found that he still had sutures remaining in his wound because not all his sutures had been removed the previous day. Due to the position of the opening and the exposure of the scalp, PA Mata placed a single staple in the middle of the opening to decrease the risk of infection and prescribed a course of antibiotics as an extra precaution.

These facts are sufficient to demonstrate Rhoads' removal of Ellison's sutures and related wound treatment caused the wound to reopen and delayed the healing process.

Accordingly, the evidence considered in the light most favorable to Ellison reflects that the United States had a duty to Ellison, the BOP medical providers allegedly breached that duty by failing to properly care for Ellison's wound at the time the sutures were removed, and that breach resulted in harm. Specifically, the wound was painful, reopened and became infected. The United States' motion for summary judgment on the claim of negligence related to the suture removal is **denied.**

### C. Pain Management

Ellison argues that he has set forth substantial evidence that the BOP's medical providers negligently mismanaged his pain.

#### 1. Post Surgery

Ellison argues that Dr. Guinn's order to provide Ellison with "5 mg" doses of "acetaminophen-HYDROcodone 325 mg – 10 mg oral tablet" to take every four (4) hours on an

as-needed basis was disregarded. He claims that this fact alone allows a trier of fact to infer that the medical providers breached the standard of care in managing Ellison's pain and that no specialized or technical medical knowledge is necessary to understand that the providers disregarded the post- operative directives of his surgeon.

In response, the defendant argues that despite several opportunities in his deposition to elaborate on his claims, Ellison never claimed that the BOP acted negligently in prescribing pain medication to him *after* his surgery and that he should not be permitted to add this new claim that was not disclosed previously.

This argument is persuasive. Ellison may not add this claim after the United States has had an expert review his specific allegations and moved for summary judgment. In addition, even if this claim had been previously disclosed, there is no evidence that the change in medication constituted a breach of the standard of care. This is not a situation in which Ellison was not given any pain medication after the surgery or where a prescription was ignored; the prescription was merely changed.

## 2. Pre Surgery

Further, Ellison set forth evidence that he was in pain and suffered from headaches from the time he developed a lipoma until it was removed. He complained that the lipoma was causing chronic headaches and dizziness. Ellison also reported intermittent pain at the site of his lipoma. At the same time, Ellison's medical records demonstrate that his medical care providers never provided him with pain medication prior to his surgery.

Concerning his allegations of pain before the surgery, Ellison does not deny that he was

able to purchase pain medication from the commissary. And Dr. Kons specifically opined that "[i]t is not standard of care to  prescribe prescription analgesics to treat" a tender lipoma.  Accordingly, Ellison's argument that the BOP medical providers breached the standard of care in managing his pain before the excision surgery is subject to dismissal.

The United States is entitled to judgment as a matter of law on the claim that BOP medical providers were negligent in treating Ellison's pain before and after his surgery.

## IV.  Conclusion

The United States' motion for summary judgment is **granted in part and denied in part.** The motion is **granted** as to claims related to the diagnosis the lipoma, the timing of the surgery, and the provision of pain medication for tenderness caused by the lipoma. The motion for summary judgment is **denied** as to the claim that Ellison's medical providers were negligent in the treatment of his wound at the time the sutures were removed. That claim will be resolve through settlement or a bench trial scheduled to commence on July 30, 2018.

**IT IS SO ORDERED.**

Date: 5/11/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

KYLE ELLISON
 FEDERAL CORRECTIONAL INSTITUTION
FCI - BECKLEY
P.O. BOX 350
BEAVER, WV 25813

Zachary A. Ahonen
JACKSON LEWIS PC (Indianapolis)
zachary.ahonen@jacksonlewis.com

Rachana Nagin Fischer
UNITED STATES ATTORNEY'S OFFICE
rachana.fischer@usdoj.gov

Dorothy D. McDermott
JACKSON LEWIS PC (Indianapolis)
Dorothy.McDermott@jacksonlewis.com

Gina M. Shields
UNITED STATES ATTORNEY'S OFFICE
Gina.Shields@usdoj.gov